IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Takoda Johnson,                      Case No. 3:07 CV 2290

          Petitioner,               MEMORANDUM OPINION
                                           AND ORDER

    -vs-
                                           JUDGE JACK ZOUHARY
Khelleh Konteh,

          Respondent.

*Pro se* Petitioner Takoda Johnson, a prisoner in state custody, filed a Petition for a Writ of Habeas Corpus (Doc. No. 1). This Court has jurisdiction under 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."). Petitioner alleges his detention violates the Sixth and Fourteenth Amendments of the U.S. Constitution.

The case was referred to United States Magistrate Judge Vernelis Armstrong for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). The Magistrate Judge recommended the Court deny the Petition (Doc. No. 13).

Petitioner filed an Objection (Doc. No. 16) to the Magistrate's denial. In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C), this Court has made a *de novo* determination of the Magistrate's findings and adopts the recommendation to deny the Petition.

## BACKGROUND

Petitioner does not object to the factual background (Doc. No. 13, pp. 2-3) or procedural background (*id.* at pp. 3-5) described in the Magistrate's Report and Recommendation. The Court adopts them in their entirety.

To give some context, Petitioner was convicted of murder by a jury in the Lucas County Court of Common Pleas. The Ohio court of appeals, considering Petitioner's direct appeal, summarized the facts as follows:

> On the morning of September 27, 2003, Toledo Police found the body of 34 year old Emanuel Zapata slumped behind the wheel of his pickup truck in a vacant lot in the central city. Zapata had been beaten to death.
>
> Police interviewed Zapata's neighbors who reported last having seen him very intoxicated at approximately 10:00 p.m. the night before his body was found. After some time, the investigation focused on a crack house a few blocks from where Zapata was found. The house was owned by the mother of Eric Johnson, who along with the unrelated appellant, Takoda Johnson, operated from there as drug dealers.
>
> The story that eventually emerged was relayed at trial in the testimony of Eric Johnson's girlfriend, Robbie Malone. Malone testified that on the evening of September 26, 2003, she accompanied Eric to the house where they found appellant and an "unidentified white male." According to Malone, Zapata arrived later: drunk and acting "goofy." At one point, Malone testified, Zapata began shadowboxing appellant.
>
> Malone testified that she was in another room, but heard a loud noise. Upon rejoining the others, Malone saw Zapata lying on the floor. Appellant, according to Malone's testimony, told her that he had struck Zapata before Zapata could strike him. In the process, it appeared, appellant injured his hand. While appellant tended his hand, Eric struck Zapata with a plastic pipe.
>
> Malone testified that things began to calm until Eric told appellant to leave Zapata alone because Zapata had AIDS. At this point, according to Malone, appellant became angry, saying that Zapata had better not have given him AIDS. Malone testified appellant began to stomp Zapata, later striking him with a two-by-four.

When Zapata offered no further resistance, appellant drove off in Zapata's truck. Appellant returned a short time later, placing Zapata in Malone's minivan. All four drove to the vacant lot where appellant had parked Zapata's truck. There Eric and appellant carried Zapata from the van and placed his body in his truck. It was at this location that police found Zapata's body the next morning.

When Eric Johnson testified, he had already pled guilty to a reduced charge of manslaughter in connection with Zapata's death and had been sentenced to four years incarceration. Eric confirmed Robbie Malone's account of events, adding that at one point Zapata attempted to leave, saying he would return with "his people." The two Johnsons did not allow Zapata to leave. Eric Johnson said that Zapata was still alive when they left him in his truck.

Appellant's testimony contradicted that of Malone and Eric Johnson. According to appellant, he punched Zapata once when Zapata came at him with a knife. When Zapata then became engaged in a fight with Eric Johnson, appellant reported that he fled the house and knew nothing of events that followed.

At the conclusion of the trial, the jury found appellant guilty of murder. The trial court accepted the verdict and sentenced appellant to an indefinite term of imprisonment of from 15 years to life.

*State v. Johnson*, No. L-04-1221, 2006 WL 751348, at *1-2 (Ohio App. 6th Dist. Mar. 24, 2006).

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, requires a federal habeas court to limit its analysis to the law as it was "clearly established" by the U.S. Supreme Court at the time of the state court decision.[1]

---

[1]

The relevant section of AEDPA provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court provided direction on the application of this standard in *Williams v. Taylor*, 529 U.S. 362 (2000). Under the "contrary to" prong of Section 2254(d)(1), a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Id.* at 405-06.

The "unreasonable application" prong of Section 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle" from the Supreme Court's decisions, "but unreasonably applies that principle to the facts" of petitioner's case. *Id.* at 413. The "unreasonable application" requires the state court decision to be more than incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (*citing Williams*, 529 U.S. at 407). Rather, the state court's application must have been "objectively unreasonable." *Williams*, 529 U.S. at 409. Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000).

**ANALYSIS**

Petitioner raised two claims in his Petition: (1) his trial counsel was ineffective under the Sixth Amendment for failing to request a jury instruction for the lesser charge of voluntary manslaughter[2];

---

[2]

R.C. § 2903.03, Ohio's voluntary manslaughter statute, provides:
>   (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
>   (B) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree.

4

and (2) his due process rights were violated at trial when the prosecutor cross-examined Petitioner about his post-arrest silence. As will be discussed below, the Magistrate construed Petitioner to be raising a third claim: his conviction was against the manifest weight of the evidence in violation of due process.

Petitioner objects to the Magistrate's conclusion with respect to each claim. Therefore, the Court conducts a *de novo* review of each.

**Ineffective Assistance of Counsel**

Petitioner claims his trial counsel was ineffective for not requesting a jury instruction for voluntary manslaughter. The trial court did instruct the jury on the lesser-included offense of involuntary manslaughter.[3]

For a claim of ineffective assistance of counsel, Petitioner must ordinarily prove two components: (1) deficiency of counsel's performance and (2) resulting prejudice, such that there is a "reasonable probability" counsel's unprofessional errors affected the outcome. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Under the first prong, the burden is on Petitioner to "identify[] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Judicial scrutiny of trial counsel's performance must be "highly deferential." *Id.* at 689. Under the second prong, Petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

---

[3] Under Ohio law, voluntary manslaughter is not a lesser-included offense of murder; rather, it is an inferior degree of murder. *State v. Tyler*, 50 Ohio St. 3d 24, 36-37 (1990).

Petitioner raised this argument on direct review. The Ohio court of appeals found Petitioner's claim lacking. The appellate court held:

> First, a fair view of appellant's trial strategy reveals that he sought to place the responsibility for Zapata's death on Eric Johnson. Trial counsel may well have wished to limit jury options in considering scenarios in which he had any culpability. This is an exercise of trial strategy which must be presumed effective. Second, since the jury found appellant guilty of murder, it seems improbable that giving it an additional lesser option would have resulted in a different verdict. In this circumstance, prejudice is not demonstrated. Accordingly, appellant's first assignment of error is not well-taken.

*Johnson*, 2006 WL 751348, at *3.

Trial counsel will often be presented with a strategic decision to either request or not request specific jury instructions at trial. Counsel will not be deemed constitutionally ineffective if they choose not to request a particular instruction, provided that such a decision constitutes sound trial strategy. *Goldsby v. United States*, 152 F. App'x 431, 437 (6th Cir. 2005). Counsel's failure to request a jury instruction for a lesser offense is not constitutionally deficient when "[c]ounsel made a strategic decision to advance . . . more plausible defense theories, rather than to present the jury with a different story of how the [crime] took place." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002).

In *Garrison v. Gundy*, No. 1:04-CV-196, 2006 WL 2356218 (W.D. Mich. 2006), the habeas petitioner, who was convicted of second-degree murder, claimed his trial counsel was ineffective for not requesting an instruction for involuntary manslaughter. Throughout the trial, petitioner raised a self-defense argument, claiming the victim was the initial aggressor. Citing the Sixth Circuit's decision in *Scott*, the court denied the claim, noting "[i]t would be inconsistent, if not unsound trial strategy, for petitioner's counsel to request a jury instruction which provided that petitioner was either grossly negligent or had an intent to injure the victim, after steadfastly arguing throughout the trial that petitioner acted in self-defense and was entirely innocent." *Id.* at *7.

6

Under current case law, the Ohio appellate court's resolution of this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.

At trial, Petitioner testified that he allowed the victim into the house, the victim produced a knife and swung it at him without provocation, at which time he punched the victim once in the mouth and then fled, having no further contact with the victim (Trial Transcript, Doc. No. 8, Ex. 20, pp. 491-531). Petitioner clearly attempted to shift the blame of the attack onto Eric Johnson (*id.* at pp. 525-31). Petitioner testified that after he saw Eric Johnson beating the victim, Petitioner simply ran back to his own house and went to bed (*id.* at pp. 530-32).

Given that the crux of Petitioner's defense was that he did not kill the victim, rather Eric Johnson did, it was sound trial strategy for counsel to limit the jury's options to scenarios which denied Petitioner's culpability. Petitioner argued throughout trial that he was entirely innocent. It would have been inconsistent for Petitioner's counsel to request an instruction suggesting that although Petitioner killed the victim, he did so while suddenly provoked.

**Use of Post-Arrest Silence at Trial**

Petitioner maintains he is entitled to habeas relief because during the prosecutor's cross-examination of Petitioner, the prosecutor impermissibly commented on Petitioner's post-arrest silence. The transcript of the questioning at issue reads as follows:

> Q. You had numerous opportunities to talk to the police, the prosecutor, anybody about this prior --
> [Defense Counsel] Your Honor, I'm going to object. May we approach.
> [The Court] Yes. I'm going to sustain the objection. Is that what you wanted to approach about?
> [Defense Counsel] Yes.
>
> \* \* \*

7

Q. The first time you talked to Detective Smith, a police officer, was in April, is that correct?
A. I believe so, yes.

Q. Okay. And that is some seven months after this event occurred?
   [Defense Counsel]   Your Honor, this whole line is totally improper.
   [The Court]   Well, it is cross examination. The first question, I'm going to allow it. You may object again. It's cross examination. I'm going to allow it.

Q. Some seven months after this event occurred?
   [Defense Counsel]   Your Honor, may we approach and get it on the record?
   [The Court]   Yes
   (Whereupon, a Bench discussion was held as follows.)
   [Defense Counsel]   When he turned himself in, he did not have a lawyer. At that time, he requested to have Ronnie – contact Ronnie Wingate. Ronnie Wingate could not be retained. It was some couple weeks later Ronnie was appointed to represent him. It was my decision that he talk to nobody at that time because it was my decision that – my advice to him. Now, he has a right to remain silent, and this is commenting --
   [Prosecutor]   Judge, he's waived his right because he's taken the stand.
   [Defense Counsel]   He's waived his right in April, and he's waived his right now. He's testifying now. But you're making something out of that he should have come forward sooner.
   [The Court]   Make your record.
   [Prosecutor]   Judge, he last waived his right, Fifth Amendment rights, by taking the stand. I've only asked him, it's been seven months. You waited seven months before the first time that he talked to the police. That is a fair question. He's waived his Fifth Amendment right by taking the stand, and that's clear in all the case law.
   [The Court]   I'm going to allow it. You made the record.
   (Whereupon, the Bench discussion was concluded.)
   [The Court]   You may continue, Mr. Prosecutor.

Q. You talked to Detective Smith it was some seven months after this event occurred; is that correct?
A. That isn't correct. Maybe five months.

8

> Q. Okay. This occurred at the end of September; correct?
> A. Yes.
>
> Q. All right. The month of October would be one month; correct?
> A. Correct.
> [Defense Counsel] One second. Wait. Since he was arrested in – he was arrested the end of October?
> [Prosecutor] I said since the incident occurred.
> A. You didn't say that at first, sir.
>
> Q. Has it been seven months since the incident occurred before you talked to Detective Smith?
> A. Yes. Yes, it have.

(Tr., pp. 542-46).

The Ohio court of appeals held that the trial court erred in permitting questions concerning Petitioner's post-*Miranda* silence. However, the court found the error to be harmless. The court reasoned:

> Two witnesses testified that they were present when appellant participated in the delivery of a beating to Emanuel Zapata that resulted in his death. These witnesses' testimony is consistent between themselves and other witnesses and consistent with the physical evidence. Appellant's testimony was that the five foot eight inch, 120 pound Zapata attacked him, threw him to the ground, then pulled a knife. According to appellant, he then ran from the house and did not return. The jury clearly believed the state's witnesses over appellant. We see no likelihood that this would have changed had there been no question concerning appellant's post-arrest silence. Consequently, the trial court's error in permitting that line of questioning was harmless beyond a reasonable doubt. Accordingly, appellant's second assignment of error is not well-taken.

*Johnson*, 2006 WL 751348, at *5.

This Court agrees with the Ohio court of appeals that the line of questioning by the prosecutor was unconstitutional commentary on Petitioner's post-arrest silence. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (violation of due process for prosecutor to cross-examine defendant about his post-arrest silence).

Having determined the questioning of Petitioner's post-arrest silence was improper, the Court now determines whether the error was harmless. Habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Under the actual prejudice standard, courts deem an error harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This standard of review requires a reviewing court to examine the effect of the error on the jury rather than the sufficiency of the evidence at trial. *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 769 (N.D. Ohio 2003). However, if the matter is so evenly balanced that the court has "grave doubt" as to the harmlessness of the error, it should treat the error not as if it were harmless, but as if it affected the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).

Here, the Court finds the questioning concerning Petitioner's post-arrest silence did not have a substantial and injurious effect or influence on the jury. As noted by the Magistrate in her Report and Recommendation, the prosecutor asked Petitioner seven questions concerning the time frame between the incident and Petitioner speaking with police. The first question the prosecutor asked was when Petitioner first spoke to police. The second question asked was how many months had passed. The remaining five questions were asked to clarify the time frame. After this exchange, the prosecutor did not bring up post-arrest silence again. There was no mention of Petitioner's post-arrest silence in opening or closing argument. Furthermore, two witnesses testified consistently as to Petitioner's actions, and their testimony was corroborated by medical evidence. Viewed in this context, the Court finds it improbable the jury would have believed Petitioner's testimony absent the questions about his post-arrest silence.

Therefore, the Ohio appellate court's conclusion that the questioning on Petitioner's post-arrest silence was harmless error was neither contrary to, nor an unreasonable application of, clearly established federal law.

**Weight of the Evidence**

In her Report and Recommendation, the Magistrate construed statements in Petitioner's Traverse (Doc. No. 12) about conflicting testimony of witnesses to be raising a claim that Petitioner's conviction is against the manifest weight of the evidence (Doc. No. 13, pp. 13-14). The Court notes that Petitioner never raised this claim in his Petition (Doc. No. 1), and this Court does not believe Petitioner attempted to raise the claim in his Traverse, even applying a liberal construction. *Givens v. Yukins*, 238 F.3d 420, at *4 (6th Cir. 2000) (table).

Regardless, the Court agrees with the Magistrate that such a claim is not cognizable under habeas review. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).

## CONCLUSION

After conducting a *de novo* review of the portions of the Recommendation to which Petitioner objected, the Magistrate's Report and Recommendation is adopted. The Petition is dismissed. Further, under 28 U.S.C. § 1915(a)(3), the Court certifies that an appeal of this action could not be taken in good faith and no certificate of appealability shall issue.

IT IS SO ORDERED.

                                                  s/ *Jack Zouhary*
                                                  JACK ZOUHARY
                                                  U. S. DISTRICT JUDGE

                                                  February 11, 2009